Thank you very much, we'll take this interesting matter under advisement and we'll hear counsel in the next case, is that alright? Can we get one? We'll hear counsel in Giddings v. Joseph Coleman, Center. Thank you, Mr. Leal, for coming. May I reserve three minutes for rebuttal? Yes, of course. Thank you. Your Honor, a reasonable jury could conclude that Agent Cluel on the night of December 2nd knew that Giddings faced a substantial risk of further self-harm and deliberately disregarded that So that knowledge occurs at what point along the timeframe? She's already aware that razor blades are common at the Center. When Giddings cuts himself the first time, she says, oh, I've seen these razor blades before. After it happens the first time? That's right. As soon as she knows that he's cut himself and knows that it's because of a razor, that she herself says she's seen frequently at the Center. This is on page 159 of the appendix. She says it was a typical razor blade that you see at Coleman Hall. I didn't even ask where he got it because I've seen them so frequently. So she's aware that he's cut himself. She knows that razor blades are available. Residents at the Center get them all the time. She's also testified that she has a background in behavioral science. She's familiar with self-mutilation. This is 148 to 149 of the record, the appendix. She's familiar with cutting behavior and she says it's because when somebody is upset. Her education as what? She has a bachelor's degree in behavioral science and she explains in her deposition testimony that as part of that educational training she's come to understand this cutting behavior occurs when someone is upset or angry. They take that out on themselves in order to relieve the pressure. So why was she not justified in believing that the Harmony Unit staff, which presumably is trained in a way she is not, to deal with the psychological issues that apparently gave rise to an impulse to cut himself? Your Honor, she explained in her deposition that the Harmony Unit is a mental health unit in name only. She says on page 155 of the appendix that the inmates received, the residents received the same treatment in any of the units. The Harmony Unit isn't any more secure than the other units. He's just as likely to get a hold of a razor blade in that unit as in the other units. And she also testifies that a psychiatrist only comes into the center one day a week for a couple of hours. So he's not going to get psychiatric treatment that night. And it's psychiatric treatment that he needs in order to prevent this cutting behavior. So on her own testimony, he's no more protected in the Harmony Unit than in any other unit. Noble? A reasonable jury could infer this on page 155 of the appendix, reading from her deposition. The question is asked, were any of the units more restricted than the other units? Answer, no. Okay, it was just a way to group the residents. Answer, yes. They all received the same treatment. Answer, to my knowledge, yes. But we're not talking about treatment here, I think. I mean, in stressing that she, the jury could find that on the evening of December 2nd, she knew that there was a need for him to have a safe environment where he could not hurt himself. And she was deliberately indifferent to that serious medical need that he had to be in an environment where he couldn't hurt himself. You didn't quote her report, but her report said she knew that he, she felt that he presented a threat to himself. That's right. Okay. That's right. But, so what's needed is somebody to search the room and make sure he's placed in a position where he can't hurt himself. Now, why, the question is, why was she not justified, or how can she be considered deliberately indifferent just because she assumed that these other people who had the same knowledge that she did about what he had done this afternoon were not going to make sure he didn't get a, he was in their custody. They had a duty to take care of him. Why could she not assume that they would take him around, look around for razor blades? She never once asked them to do that. If she'd had a conversation with the staff and said, now, you're going to make sure he doesn't get another razor blade, that might be a different situation. But she, on her own testimony, she never has that conversation. She never once says, make sure this guy doesn't get another razor blade. Check his room, check his body. She doesn't do that. And she's aware that residents have these blades. And on the issue of custody, it's true that the Coleman Center staff ... Absolutely. Does the record demonstrate that she is aware that they have these blades once they're in the Harmony Unit? She has ... The record doesn't give any indication that she would have some reason to believe that they don't have razor blades in that unit. She says, all the units are the same. No unit is more restrictive than any other unit. There's no higher security in the Harmony Unit than in the other units. What does the record show as to the reason he was sent to the Harmony Unit? It's unclear. It's unclear. The Coleman Center staff apparently thought that that was a better place for him. But she never had a conversation with them to verify that he would be more protected in that environment. And if I could just ... On the issue of custody, it's true that the Coleman Center staff had contracted to provide services at this private facility. But the parole board is his legal custodian under Pennsylvania law. The parole board is his custodian, and she's vested with ... Agent Cool is vested with the parole board's authority. She's his legal custodian on that night. So is that why the ... I should have asked this in some way prior to today, but I'm curious as to why the Eighth Amendment is triggered here as opposed to just the Fourteenth Amendment since he is in her custody, but he's on parole. What's the authority for the applicability of the Eighth Amendment? Agent Cool's own argument is that the Coleman Center is analogous to a prison. She's his custodian for Eighth Amendment purposes, which is why the Eighth Amendment applies and not the Fourteenth Amendment. So I think Agent Cool would be stopped from making the argument that you're suggesting. Now, it's true that ... You pleaded though both and relied upon both an Eighth Amendment theory and a Fourteenth Amendment. That's correct. That's correct. And presumably if the legal determination were made that Agent Cool was not his custodian for Eighth Amendment purposes, then presumably in the alternative there'd be a substantive due process claim that would survive that determination. But we pled both of them and we've been ... And our position is both of them apply in this case with an Eighth Amendment claim and a substantive due process claim. What do you make of this language from our Spruill versus Gillis decision? We conclude that absent a reason to believe, paren, or actual knowledge, and a paren, that prison doctors or their assistants are mistreating, paren or not treating, a prisoner, a non-medical prison official, like Gouler in this case, like Cool in this case, will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference. If I recall that passage from Spruill correctly, I believe that's in the context of an inmate who is already committed to some medical doctor's care. And so that language is in the context of if an inmate is committed to the care of a doctor, then non-medical inmates or non-medical prison personnel are justified in assuming that the medical doctor is going to provide the care that's appropriate. But here, Gillis isn't in the care of any doctor. In fact, quite the contrary, and there's a fact dispute on this, Gillis is pleading to be taken to the hospital on the night of the second, saying he needs help. And Cool says, no, I'm not going to take you to the hospital. So to the extent that Spruill, the language from Spruill is predicated on that assumption, it wouldn't apply here. And so there is that fact dispute in the record as to whether Mr. Gillis pled with Cool to take him to the hospital. She claims he never did. She claims he never, she claims she said, do you need medical treatment? And he said, no, I don't. He says, I said, please take me to the hospital. And she said, no, I'm not going to do that tonight. I can take you in the morning. You've suggested that there was no difference between the various units there, that Harmony effectively was no different from the others. Is that the position you've taken? There's evidence in the record to support that. And a jury could conclude that that's the case. Well, there's also this at A155 of the appendix, and that's Ms. Cool saying, if someone needed mental health treatment, if they were required by the parole board to have mental health treatment, or they were taking medications and needed psychiatric care, generally they were placed on the Harmony side because that was counselors they were supposed to have like mental health training. There's no indication from that testimony that he's going to have more protection from razor blades or from self-inflicted harm in the Harmony unit than in other units. Simply because there's counselors there who have some mental health training doesn't mean they're any more competent to identify razor blades that are hidden in the room or on the person of the resident. So a reasonable jury could conclude from this that he's in just as much danger in that unit as in any other unit. And again, Agent Cool never had a conversation with the staff to be protected from danger. She didn't say, make sure he doesn't get razors. Why isn't that just negligence? As distinguished from deliberate indifference. That was the question that was coming up. It's not negligence. It's not negligence because she's aware that he's already cut himself once. And it wasn't a great big cut. Well, that's a fact dispute as well. Now, she says it's a cat scratch or a super cut. Bandage or something. Well, but on Mr. Gidding's testimony, it was serious enough that he felt he needed medical treatment that night. So there's a fact dispute both on the extent of the cut and on He doesn't say it was a four or five inch cut, does he? He does say it was bleeding that night. Yeah, you know, if you have kids, you know, they bleed all the time. You know, they have little scratches and little cuts. Well, we Bleeding itself does not indicate a significant injury. It was significant enough for him to plead to be taken to the hospital, and that was denied. Yeah, well On his testimony. I know, but we know that prisoners like to go out on little trips. And certainly by the next morning, it was quite a bit worse. On page 445 of the appendix, there's a picture of the cut the next morning, and it was a very deep cut. It required stitches. He lost a lot of blood as a result of that cut. So certainly by the next morning, it was very serious indeed. And furthermore, by that next morning, Agent Kruel had actually read in his file further proof that he was prone to hurting himself. Go ahead. I'm sorry. Oh, no, I But finish your sentence. Further evidence that he was prone to self-mutilation. She'd read in the file that there were suicide attempts and had further evidence that he could harm himself, and even then failed to take steps to prevent that. Thank you. Thank you. May it please the court. I'm Claudia Tesoro from the Pennsylvania Attorney General's Office, and I represent Agent Kruel, needless to say. Summary judgment in Agent Kruel's favor was warranted, as has already been discussed, because she was not deliberately indifferent to any serious medical needs that Mr. Giddings may have had. Is this an Eighth Amendment case? Well, we've all certainly taken that approach, and I think the reason that it's an Eighth Amendment case is that the Coleman Center is de facto like a jail. The residents there are under very strict restrictions, albeit not as much as a maximum security prison, but they are by no means free to come and go. That's what I was going to ask. Mr. Giddings, as a parolee, was still subject to a state sentence, and he was being housed there in a halfway capacity, you might say, but he was under a state sentence on parole in an institution where he had no autonomy as far as his movements, the way a person would when out in free society. Let me take you back to your initial statement. We are at a summary judgment stage, right? Of course. A summary judgment that the district court granted. The evidence indicates that Clewell knew that Giddings had cut himself on the afternoon of the 2nd with a razor because he was unhappy at the center. We know that she noted in her report that he presented a threat to himself, quote, unquote, threat to himself. We also know that she knew razor blades were readily available at the center. Now, I could not a jury think that Giddings had a serious medical need on the afternoon of December the 2nd for a safe environment in which he could not hurt himself. Could not a jury find that? The existence of a serious need is really not in dispute at this point. Oh, I'm sorry. I thought you began by saying that there was no serious medical need. No, I tried to say that she was not deliberately indifferent to whatever serious need he had, which for purposes of argument, we have not contested the notion that there was a serious need, although I think you might be able to say she didn't instantly recognize the scope of it, but that became more clear. I'm not sure the district court understood that he had a serious medical need on the afternoon of the 2nd, but in any event, we're in agreement. Yes. Now, she left him in the center that had triggered his first cutting that afternoon. Well, my understanding was that he was eating. She testified that she did not either search him or search the quarters to which he was going, nor did she ask anybody else to search him or to search the place that he was going. She said that she assumed that the center staff would do that, and she had, quote, had had a long day and wanted to go home, unquote. Now, I agree that maybe, well, can't you draw, can't reasonable minds draw different inferences about that, and on summary judgment, would not the record support that, a finding that she was deliberately indifferent to his need at that time for a secure environment in which he couldn't hurt himself? No, I don't think so, and the reason I don't is that she observed from a distance the events in that room where he was holding the razor to himself that evening, and I believe it was evening rather than afternoon, but that's a detail. Okay. However, while that was going on, the record also shows that she contacted her supervisor to explain what was happening, and they discussed the situation. As was pointed out earlier, Agent Kuhl was aware that this was not normal behavior, but she also was aware as things unfolded that the situation settled down. She and her supervisor had specifically talked about what to do under these circumstances and concluded that if he could wait until morning, if things were stable enough, then that's what should be done, because that's when additional agents could assist with taking him back into state custody. She really thought he should be taken elsewhere, but they didn't have the personnel available to do it. Isn't that right? Well, there are two different elsewheres that we talk about here, and I think that the appellant tends to mush them together. She had a parole violator, no matter what the nature of the violation, is going to get taken back to a state correctional institution for parole violation proceedings. A person who needs treatment for some medical condition needs to get treatment somewhere. Ms. Kuhl was specifically aware that when misdemeanors got back to Graterford, there was treatment there that was more extensive than what was available at the Coleman Center. Another important fact that has been overlooked in the conversation up to now is that when she talked to her supervisor, the possibility of enlisting the assistance of the police was raised, and in Ms. Agent Kuhl's written statement, as opposed to her deposition, she explains that that was to get Mr. Giddings committed under Section 302 if necessary. In other words, if his behavior and mental state were so bad that he couldn't last until morning. The decision that was made to put him in the Harmony Unit, I think as was pointed out earlier, was one based on the fact that one can only infer on this record that the Harmony Unit is different than the other units in some respects. That's where the mental health treatment, such as it is, is provided. In what respects is it different, and how are those differences meaningful to this case and the application of the Deliberate Indifference Standard? I think the record shows that the Harmony Unit is designated as the mental health unit. The director of the Coleman Center, Mr. Arroyo, was specifically advocating that Mr. Giddings should just go there and stay there on an extended basis. He, in fact, induced Ms. Kuhl, in part anyway, to keep Mr. Giddings there, did he not? He certainly wanted him to be there open-endedly, but it's certainly overnight. In fact, Mr. Giddings himself agreed to it by the time this was discussed among the three of them. He may not have been happy about it, but he was okay with it, at least for the night, because he understood that he would be getting more treatment the next morning. In fact, he did get more treatment the next morning when he was taken to Graterford. The medical records are in the appendix. On that score, I think I'd also like to remind the Court that it wasn't an either-or situation between going to prison and getting treatment. Going to prison involved getting treatment, and the treatment that Mr. Giddings may have been pleading for, if you accept his version of what happened the evening before, was some kind of ill-treatment. But a person in his position, unfortunately, cannot simply say, gee, I really need treatment and expect to get it. It isn't, as a practical matter, going to happen with a resident in a facility such as the Coleman Center that he can just step out the front door, with or without the parole agent, and go to Jefferson Hospital. He had to accept what was available to him, and he did. Whether Agent Cluel should have done more than she did is really not the point, because the law says that if a defendant in a situation like this makes a conscious judgment, taking whatever risks the plaintiff faces into account, which Agent Cluel did, then even if that judgment turns out to have been wrong, it still does not amount to deliberate indifference if the person acted reasonably under the circumstances. Is it possible to say here that she should have done something differently? Well, with hindsight, we can certainly say that, but that is, at most, negligence on her part. I don't want to suggest that I agree that she was even negligent, but if she was, negligence and deliberate indifference are, of course, two different things. Her duties also are part of the calculus here, and I think we have made an assumption that is not warranted on the record that a parole agent was somehow the person in charge of this entire facility. She was not. A parolee is, of course, subject to the supervision of the parole board, but that does not mean that Agent Cluel was the person who would do everything, give people orders, make sure every single possible thing was done. This individual was in the Coleman Center for a few more hours in the care of the people who ran the Coleman Center. Were there razor blades in the building? Of course there were. This is a place that housed 300 men who probably mostly shaved every day. Razor blades unquestionably would have been floating around, but that detail does not mean that there was any reason on Agent Cluel's part to believe that Mr. Giddings was going to get another one when one had just been taken and flushed away, and that he would hurt himself with it. Again, under Farmer v. Brennan, even if the harm is not averted, it doesn't mean that there is deliberate indifference. If the person acts reasonably under all the circumstances given his or her duties and responsibilities. We haven't spoken about the events of the following morning, but I think those reinforce Agent Cluel's contention that she was not deliberately indifferent to Mr. Giddings' needs. When did he inflict the second cut? Because I gather from your brief that that was a much deeper cut than the first cut. Apparently the second cut was much deeper. It apparently was inflicted sometime that morning before Mr. Giddings came to or was scheduled to come to the parole room where Agent Cluel and the other parole people were waiting for him. And the picture in the appendix to which Mr. Fondle called our attention was of the second cut, as I understand it. As I understand it as well. I think that picture was taken when he got to Graterford. Because as you'll recall, the record shows, and there's no dispute about this, that when he didn't come to the room where he was supposed to come, he was found back in his own room for whatever reason, and the cut had already occurred at that point. The second cut. Yes. And Agent Cluel immediately contacted the on-site nurse who came, examined it, and cleaned it and bandaged it. She did say that it would require stitches, and Agent Cluel, as corroborated by, I believe it's McKnight, specifically said, is it safe to transport him to Graterford before he gets the stitches? And the nurse definitely said that it was. So Agent Cluel's behavior the second morning at the center was also indicative of a person who was the opposite of deliberately indifferent. She was trying to make sure that this man's immediate needs were dealt with and that he was taken to a facility that would be able to deal not just with the need for stitches but with the larger need that he evidently had for mental health treatment. Mr. Sorrow, you touched on something a few minutes ago that, as far as I can recall, you did not really make an issue out of in your brief, but I'm wondering now that you've raised it, what the implications are for the fact that Ms. Cluel was not an employee of the center but rather was a parole agent of the Pennsylvania Board. What importance, if any, does that have to this case and her obligations vis-à-vis Mr. Giddings with respect to our determination as to whether or not she was deliberately indifferent? I'm assuming you pointed that out a few minutes ago for some reason. Perhaps not. Well, I pointed it out in the context that she is a parole agent and the duties of a parole agent in general are to make sure somebody complies with conditions of parole and is sanctioned if not, and that is stated in a narrow way. In a facility like this, I guess what you're asking brings us back closer to that issue about Eighth Amendment versus Fourteenth Amendment, although in the long run I don't think it matters because deliberate indifference would be the test either way. Well, obviously, as his parole officer, she can violate him, right? Yes, although she was not his parole officer. I know. She was filling in for somebody else, so she didn't even know his case as well, presumably, as his parole officer did. Right. But what are, pursuant to her duties as a parole officer, what courses of action are available to her on the spot? It seems to me that the record doesn't really go into depth on that. No, I don't think it does. But the only way you can reconcile her testimony about what she did and why she did it is that as a parole agent, her primary duty is to ensure that her parolees succeed on parole if possible, and if something happens that she knows about that she has to follow up on, she follows up as best she can. Can she act unilaterally to transfer him out of Coleman to somewhere else short of violating it? Absolutely not, that I'm aware of. That's why she spoke to her supervisor. And can she do that on her own, or does she have to talk to her supervisor? To violate him. Or to transfer him, short of the violation. My understanding of the violation process is that the initial on-the-spot decision she makes on her own, and if it were a more routine thing like a hot urine, for example, she wouldn't have to call her supervisor to discuss it. This was not quite as common a situation as that. But once a violation is commenced and the paperwork is written up and so on, it is reviewed by the supervisor and signed off on by the supervisor. Thank you. Your red light is on. Thank you. Mr. Fogel? Mr. Fogel, I just want to comment. When I had said, well, it was just a scratch, I was talking about the first cut. I thought it was evident in the context. The issue was to what extent that first scratch cut, call it a cut, gave Ms. Krull notice of the situation. And you called my attention to the photograph that suggests a much deeper cut. But do you agree that's after the second cut? Absolutely. And I certainly didn't intend to mislead you. I wasn't suggesting that. I just wanted to make the record clear. What I was trying to make clear was that the second cut is in the same place as the first cut. And what he did was he made that first cut deeper the next morning. So we don't really know. There's a fact dispute as to just what the nature of the cut was on the first night. She says it was a cat scratch. He says he was bleeding and needed to go to the hospital. And unfortunately what happened was he made the cut deeper, and so we can't really reconstruct exactly the nature of the first cut. That's after he was transferred to the Harmony Unit, though. That's right. That's right. That's right. Just speaking to the issue of Agent Krull's duties, it's a little late in the game for Agent Krull to be arguing that her duties as a parole officer somehow exempt her from responsibility. But she clearly has some duties with respect to the parole unit. Well, but they certainly do impact to some extent on the deliberate indifference question, don't they? Because what her duties are and what she is capable of doing lawfully necessarily constrain whatever action she can take with respect to him, don't they? Well, she did say that. This is page 168 of the appendix. She did say that she could have. She had the ability to call an ambulance or take him to the hospital if she felt that was appropriate. Anybody there could have done that, right? But she has the authority to overrule Coleman Center staff if she thinks some course of action is more appropriate. So when you were asking about unilateral action, she does have that authority. In fact, she did. The Coleman Center staff wanted Mr. Giddings to stay there indefinitely, and she overruled that. By violating him or by unilaterally directing his transfer? When you say violating him. A violation. You mean imposing? Yes. Okay. I suppose it's common parlance among officers, but I suppose it can be a bit of an indelicate term otherwise. It's a strange term. She certainly did unilaterally remove him from the center over their objection. Presumably that was within her authority to do that. The problem was that he didn't get the treatment. We don't dispute that he got treatment, both physical treatment for the cut and psychiatric treatment. He got the medication that he needed to control this disorder that he has at the prison. We don't dispute that he got that treatment at the prison. The problem is that he didn't get it for several hours. It was several hours too late, and by that point he had already cut himself a second time and the damage had been done. But in terms of her duty, she clearly as a parole officer that night had duties to ensure that he was protected from further self-harm. She's aware that he has a razor blade. She clearly has the minimal duty of asking the center staff to make sure he doesn't get his hands on another blade. Thank you very much. Mr. Fogdale, I gather that you're a pro bono attorney and your office has often provided that help to the court. Is that right in this case? That's correct. And I want to express the appreciation of this court to the Schneider firm for letting you do that. Thank you very much. Thank you. Same thing I think comes up in the next case with another firm. Thank you. Thank you very much. Absolutely. You know, we tend to be very careful. The next case is with Evergreen. That's right. And I think they were asking for a lawyer for a while. Yes. Thank you.